**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| ANGELICA HART; ERICA FRAKES; JEFFREY G. SHARP; SHONNA REED, <br><br> Plaintiffs-Appellants, <br><br> and <br><br> THERESA MCNERNEY, Guardian Ad Litem for W.N., <br><br> Plaintiff <br><br> v. <br><br> BENTON COUNTY (OR) SHERIFF'S OFFICE; KEVIN MILLS; RYAN EATON; CHRISTOPHER DUFFITT; GREG GOLLER; JAMES HARDISON; BEN DRONGENSEN; DAVE IVERSON; JUSTIN BOWERS; DAVID PETERSON; BRIAN HORN, Deputies; CORVALLIS POLICE DEPARTMENT, <br><br> Defendants - Appellees. | No. 13-35080 <br><br> DC No. CV 12-0031 AA <br><br> MEMORANDUM[*] |

Appeal from the United States District Court
for the District of Oregon

---

[*] This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

Ann L. Aiken, District Judge, Presiding

Argued and Submitted April 7, 2016
Pasadena, California

Before:     TASHIMA, SILVERMAN, and GRABER, Circuit Judges.

Plaintiffs-Appellants Angelica Hart, Erica Frakes, Jeffrey Sharp, and Shonna Reed ("Plaintiffs") appeal the district court's order granting summary judgment to Defendants-Appellees, Benton County Sheriff's Office, Corvallis Police Department, and ten individual police officers ("Defendants").[1] We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

In October 2011, nine officers of the Benton County Sheriff's Office and the Corvallis Police Department executed a search warrant at a residence, seeking evidence that one of the occupants had failed to register as a sex offender.[2] The house belonged to Plaintiff Sharp, who considered it (the "Sharp residence") to be a boarding house for homeless people in the area. The officers were aware that several homeless people, including convicted felons, parolees, and probationers,

---

[1]     Nine of the officers-defendants, Sergeant David Peterson, and Deputies Brian Horn, Ryan Eaton, Christopher Duffitt, Greg Goller, James Hardison, Ben Drongensen, Dave Iverson, and Justin Bowers, participated in both searches. Deputy Kevin Mills was on standby at the station during the first search, but participated in the second search.

[2]     Plaintiffs do not challenge the particularlity of the search warrant or the probable cause finding underlying the warrant.

intermittently lived at the Sharp residence. When the officers arrived at the Sharp residence, noone answered the door. The officers then tried the door, which was unlocked, and entered the house. They had no idea who or what was waiting for them inside. While the officers were securing the residence in preparation for the search, they pointed their guns at Plaintiffs Hart, Frakes, and Reed.

When the officers found a substance consistent with methamphetamine, they promptly halted their search and obtained a second warrant to search for evidence of controlled substances and drug paraphernalia. After the second search, Reed, who remained handcuffed during both searches, was arrested for possession of methamphetamine.[3]

Plaintiffs brought claims under 42 U.S.C. § 1983 against the officers involved in the searches, alleging that the officers used excessive force and conducted an illegal search in violation of the Fourth Amendment. The district court granted summary judgment to Defendants. Plaintiffs appeal.

We review a district court's grant of summary judgment *de novo* to determine whether, "viewing the evidence in the light most favorable to . . . the nonmoving party, there are any genuine issues of material fact and whether the

---

[3]     Neither Reed nor any of the other occupants of the Sharp residence were criminally charged based on these searches.

district court correctly applied the substantive law." *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004) (citation omitted).

1.    Plaintiffs contend that Defendants used excessive force against them in violation of the Fourth Amendment by pointing guns at them and by detaining Reed in handcuffs for several hours.[4]

## A.    Legal Framework

Police officers executing a search warrant may lawfully "detain the occupants of the premises while a proper search is conducted." *Bailey v. United States*, 133 S. Ct. 1031, 1037 (2013) (quoting *Michigan v. Summers*, 452 U.S. 692, 705 (1981)). To effectuate such a detention lawfully, officers must use objectively reasonable force. *Muehler v. Mena*, 544 U.S. 93, 98–99 (2005). To determine whether a particular use of force is reasonable, we balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the

---

[4]    Plaintiffs also argue that Defendants used excessive force by deploying nine officers to execute the search warrant. Under our precedent, the deployment of multiple officers to execute a search warrant is not analyzed as a type of "force" under *Graham v. Connor*, 490 U.S. 386 (1989). Instead, the Court has considered the number of officers on a scene in relation to whether the plaintiff posed an immediate threat to the officers and thus whether the officers had a legitimate interest in the use of force. *See, e.g.*, *Green v. City & Cty. of S.F.*, 751 F.3d 1039, 1050 (9th Cir. 2014).

In this case, there were eight people in the Sharp residence when nine police officers arrived to execute the first search warrant. Thus, the number of officers on the scene does not factor significantly into the excessive force analysis.

countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted). We must evaluate the reasonableness of the force used "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

We apply *Graham*'s excessive force test in three steps. "First, we must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount of force inflicted.'" *Glenn v. Wash. Cty.*, 673 F.3d 864, 871 (9th Cir. 2011) (quoting *Espinosa v. City & Cty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010)). "Second, we evaluate the government's interest in the use of force." *Id.* (citing *Graham*, 490 U.S. at 396). "Finally, 'we balance the gravity of the intrusion on the individual against the government's need for that intrusion.'" *Id.* (*quoting Miller v. Clark Cty.*, 340 F.3d 959, 964 (9th Cir. 2003)).

## B.     The Severity of the Intrusion

In evaluating the severity of the intrusion on a plaintiff's Fourth Amendment rights, we examine both "the type and amount of force inflicted." *Miller*, 340 F.3d at 964. We have said that "pointing a loaded gun at a suspect, employing the threat of deadly force, is use of a high level of force." *Espinosa*, 598 F.3d at 537. The Supreme Court has determined that "correctly apply[ing]" handcuffs on an

5

occupant of a home being searched pursuant to a valid warrant constitutes a

"marginal intrusion" on her rights. *Muehler*, 544 U.S. at 99.

In this case, Defendants used a high level of force against Hart, Frakes, and

Reed by pointing guns at them.[5]  This force was exerted only briefly, however,

while Defendants secured the premises and ascertained that Plaintiffs were

compliant and non-threatening.  Defendants also kept Reed in handcuffs while both

search warrants were executed, and while she was taken to a police station after

being arrested.  This constituted a "marginal intrusion" on her rights. *Id*.

## C.    The Officers' Countervailing Interests

Under *Graham*'s second step, we evaluate the officers' countervailing

interests. *Miller*, 340 F.3d at 964.  This evaluation is guided mainly by three

factors:  "(1) the severity of the crime at issue, (2) whether the suspect posed an

immediate threat to the safety of the officers or others, and (3) whether the suspect

was actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing

---

[5]      Hart testified that, when a police officer entered her bedroom, he pointed a gun at her upper body.  Frakes said that a police officer ordered her to get on the ground and pointed a gun at her head from approximately one foot away while she was doing so, for about thirty seconds.  Reed was asleep in her room when four police officers entered the room, grabbed her by her upper arm, and pulled her to her feet.  As Reed woke up, she saw a gun pointed at her face.  Reed estimated that the gun was pointed at her for approximately one minute as she stood up and was told she was being detained.  The officer pointing the gun then holstered it and handcuffed her.

6

*Graham*, 490 U.S. at 396). These factors are not exclusive; rather, we should "examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Glenn*, 673 F.3d at 872 (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)).

### 1. The Severity of the Crime

The officers initially entered the Sharp residence to look for documentary evidence of an occupant's failure to register as a sex offender. This is a non-violent felony. *See* Or. Rev. Stat. § 181.812 (2011). The officers knew that the suspect- occupant was incarcerated when the warrant was executed. Thus, the officers had no reason to expect violence or resistance based on the crime being investigated. This factor accordingly weighs in Plaintiffs' favor.

### 2. Whether Plaintiffs Posed an Immediate Threat to the Officers' Safety

We must also consider whether Plaintiffs posed an immediate threat to the officers. "[A] simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001).

The record does not show that objective factors led the officers to believe that Plaintiffs themselves posed a threat to officer safety. However, as discussed in more detail below, the officers had reason to believe that they would encounter one or more dangerous individuals in the Sharp residence. In light of this safety concern, the officers pointed guns at Hart, Frakes, and Reed for a few seconds – in Reed's case, no longer than a minute – until the officers ascertained that they were unarmed and not otherwise threatening. Thus, this factor weighs only slightly in favor of Plaintiffs' claim that the officers' use of guns constituted excessive force. The officers did, however, keep Reed in handcuffs for the duration of the two searches, even after determining that she was non-threatening. This factor thus weighs relatively more heavily in favor of Reed's claim that the use of handcuffs during her detention constituted excessive force.

### 3. *Whether Plaintiffs Resisted or Attempted to Evade Arrest*

Plaintiffs immediately complied with the officers' orders, and there is no evidence that Plaintiffs resisted the officers. As soon as Plaintiffs proved compliant, however, the officers lowered their weapons. Because the officers pointed their weapons only until it was clear that Plaintiffs would comply with the search, this factor also weighs only slightly in favor of Plaintiffs. Again, this factor

8

weighs more heavily in favor of Reed's excessive force claim because she continued to be handcuffed even after proving compliant.

### 4. Other Factors

In evaluating the government's interests in the use of force, the above three factors are not exclusive. Rather, we must "examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Glenn*, 673 F.3d at 872 (quoting *Bryan*, 630 F.3d at 826). Such other factors may include "whether a warrant was used" and "whether other dangerous or exigent circumstances existed at the time of the arrest." *Chew v. Gates*, 27 F.3d 1432, 1440 n.5 (9th Cir. 1994).

The police officers entered the Sharp residence pursuant to a valid search warrant, which weighs against a finding of excessive force. Further, from the perspective of a reasonable officer on the scene, entering the Sharp residence was potentially dangerous. The officers in this case had previous experience with the Sharp residence, which significantly raised the governmental interests in the use of force. The officers knew that convicted felons, parolees, and probationers regularly stayed at the Sharp residence. The officers also knew that in June 2011, a man had been arrested at the Sharp residence for holding a knife to a woman's throat and punching her in the face. Thus, when the officers entered the Sharp

9

residence, they reasonably believed they might be faced with violent individuals who would threaten their safety. This factor weighs strongly against a finding of excessive force in this case.

## D.  Weighing the Conflicting Interests

After evaluating the intrusion on Plaintiffs' rights and the government's interests in the use of force, we must "balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Glenn*, 673 F.3d at 871 (quoting *Miller*, 340 F.3d at 964).

We conclude, under the totality of the circumstances, that the officers' use of force was reasonable. The officers entered the Sharp residence not knowing how many people were staying there at the time. They had reason to believe that at least one of the occupants could be violent or dangerous. The officers did not significantly outnumber the occupants. They pointed their guns at Hart, Frakes, and Reed only briefly, until they determined that Plaintiffs did not pose a threat. Finally, although Reed was handcuffed for the duration of the two searches, the "correctly applied" handcuffs constituted only a "marginal intrusion" in addition to her lawful detention. *See Muehler*, 544 U.S. at 99.

We conclude that Defendants did not employ excessive force against Plaintiffs in violation of the Fourth Amendment.

10

**2.** Plaintiffs also challenge the reasonableness of Defendants' search of the Sharp residence under the first search warrant. The warrant authorized a search of the Sharp residence for "[e]vidence of the crime of failure to register as a sex offender," including "mail addressed to Gary Goodwin, receipts, documents, and other documents containing rental information." Plaintiffs contend that the officers should have conducted a narrower search of the residence, avoiding the closets and dressers in bedrooms where Goodwin was not staying. We disagree.

## A. The Search Was Reasonable

"A search warrant for the entire premises of a single family residence is valid, notwithstanding the fact that it was issued based on information regarding the alleged illegal activities of one of several occupants of a residence." *United States v. Ayers*, 924 F.2d 1468, 1480 (9th Cir. 1991). By contrast, if a warrant authorizes the search of *separate apartments or units*, even though probable cause exists to search only one of them, the warrant is overbroad. *See id.* A search conducted pursuant to such a warrant is unreasonable unless "the officers' failure to realize the overbreadth of the warrant [is] objectively understandable and reasonable." *Id.* (quoting *Maryland v. Garrison*, 480 U.S. 79, 88 (1987)).

Here, the search warrant authorized the search of the "residence . . . located at 732 NW 29th Street in Corvallis, Benton County, Oregon." The Sharp residence

11

was not set up as a multi-unit dwelling with distinct, separate residential units. The residents shared common areas. When the officers entered, they observed no indication that Plaintiffs' rooms were locked or set up as separate living units. Under these circumstances, it was reasonable for the officers to believe that evidence covered by the first search warrant could be located throughout the Sharp residence, not just in the attic, where Goodwin slept. Thus, a search of all the rooms – which was permitted by the warrant – was reasonable.

## B. Any Knock-and-Announce Claim is Waived

Plaintiffs also contend that the search was unreasonable because Defendants failed to knock and announce their presence before entering. Although the Amended Complaint alleges that Defendants "barged in the unlocked but closed front door (without knocking and waiting 30 seconds)," Plaintiffs made no argument in support of that claim in their briefing on any motion, or otherwise, before the district court. "[A]n issue will generally be deemed waived on appeal if the argument was not raised sufficiently for the trial court to rule on it." *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010) (internal quotation marks omitted). Because the district court did not have an opportunity to rule on the issue, it is deemed waived.

•  ●  •

Because both of Plaintiffs' Fourth Amendment claims fail as a matter of law, the district court did not err in granting Defendants' motion for summary judgment.

**AFFIRMED.**